MYERS, P. J.,
 

 for the Court:
 

 ¶ 1. Jessie Dean Ellis brought a premises-liability lawsuit against Gresham Service Stations, Inc., d/b/a Double Quick, Inc., and Bradley MacNealy (collectively, “Double Quick”). Ellis claimed that he was brutally beaten behind the Double Quick store by a group of unknown assailants. The trial court granted summary judgment -in favor of Double Quick based on a finding that no genuine issue of material fact existed as to Double Quick’s actual or constructive knowledge of an “atmo
 
 *1125
 
 sphere of violence” on the store’s premises. Finding no error, we affirm.
 

 FACTS AND PROCEDURAL HISTORY
 

 ¶ 2. On October 6, 2006, Ellis and his longtime friend of thirty-plus years, Richard Jenkins, were on their way home from work. At approximately 5:30 p.m., Jenkins pulled his vehicle into the Double Quick store located on BB King Road in Indiano-la, Mississippi, so Ellis could purchase some cigarettes. According to Jenkins, when Ellis walked out of the store, a “bunch” of guys crowded around Ellis. Jenkins saw one of them take Ellis’s cell phone and “then another one kind of hit [Ellis].” Scared, Jenkins “left.” Jenkins, who testified that he had his own cell phone with him at the time, drove around the block, without calling the police, and returned to the Double Quick store to check on Ellis. When Jenkins did not see Ellis, he concluded that Ellis had gotten away.
 

 ¶ 3. Sometime later that night or early the next morning, Ellis was found “unconscious” two blocks from the Double Quick, and he was arrested by the Indianola Police for public drunkenness. According to Ellis, after he awoke in jail, he told the police that he had been assaulted and that he needed to go the hospital. Ellis said the police offered to give him a ride to the hospital. Ellis accepted the ride, but he requested to be dropped off at Jenkins’s residence instead of the hospital.
 
 [1]
 
 From Jenkins’s place, Ellis called his sister, Jean Cummins, who came and got him and took him home with her. Cummins eventually took Ellis to the local hospital where he was diagnosed with a concussion, a broken jaw, and broken teeth. Ellis was transferred to the hospital in Greenville, Mississippi, where he stayed for a week before being transferred to a rehabilitation facility-
 

 ¶ 4. On December 27, 2006, Ellis filed an incident report at the Indianola Police Department, claiming he was assaulted by unknown assailants at the Double Quick store on October 7.
 
 [2]
 
 According to Ellis, he suffered a head injury from the attack which left him with memory loss. All Ellis recalled of the incident was walking out of the store, getting hit by an individual who was standing outside the store, then lending his cell phone to two other individuals standing outside of the store, walking around the corner of the store to retrieve it when they disappeared with it, and then waking up in jail.
 

 ¶ 5. Ellis filed suit against Double Quick on September 24, 2007. According to Double Quick, none of its employees witnessed the alleged incident, and neither the company nor its employees became aware of the alleged incident until after the suit’s filing.
 

 ¶ 6. An agreed scheduling order was entered, setting the deadline for discovery on June 30, 2008. Discovery was extended to October 31, 2008, by agreement of the parties. Both parties designated experts. Ellis’s expert, Commander Tyrone Lewis, opined that Double Quick’s premises were unreasonably dangerous, making Ellis’s assault reasonably foreseeable. Double Quick’s expert, Lee Vance, opined the opposite.
 

 
 *1126
 
 ¶ 7. In March 2009, Ellis’s legal counsel learned from Ellis of a new witness, Edgar Love, and on April 1, 2009, counsel filed a motion with the trial court to take Love’s deposition. According to the motion, Love was a “key witness in the case.” It was represented to the trial court that Love’s whereabouts had been unknown to Ellis since the October 2006 incident, and that on March 20, 2009, Love had approached Ellis wanting to know how Ellis was doing. Double Quick objected to the motion on the ground that the discovery deadline had passed and Ellis had failed to identify anyone during the course of discovery who purportedly assisted him on the night in question. Subsequently, however, the discovery deadline was extended until June 15, 2009. Love’s deposition was taken on June 5, 2009.
 

 ¶ 8. According to Love, he found Ellis lying in a ditch near the Double Quick. He helped Ellis up and brought him to the side of the Double Quick store. Love testified that Ellis was in bad shape, as he was bleeding from the head and could not talk. Love said he alerted Double Quick staff that there was an injured man outside and that they should call the police or an ambulance. Love also testified that he had seen Ellis countless times since the incident, and Love indicated that he informed Ellis as early as 2007 about the role he had played on the night in question.
 

 ¶ 9. In light of Love’s testimony, Double Quick moved to dismiss or, alternatively, to strike Love’s testimony on the basis that Love revealed that Ellis had known about the role Love had played on the date of the alleged incident and that Ellis had misrepresented to the trial court that he was unaware of Love’s existence until March 2009. Ellis’s response to Double Quick’s motion was that he had forgotten about Love’s involvement, which Ellis attributed to the memory loss he suffered due to his head injury. The trial court expressed concern that Ellis had failed to come forward with any medical proof of his purported memory loss. But the trial court conditionally denied Double Quick’s motion, finding there was insufficient proof to determine whether Ellis’s inability to comply with the discovery deadlines was willful or not. The trial court left the door open for the parties to revisit the issue with appropriate expert and medical testimony.
 

 ¶ 10. Double Quick moved for reconsideration of the issue and submitted the testimony of Ellis’s treating neurosurgeon, Dr. Lenard Rutkowski. According to Dr. Rutkowski, Ellis’s concussion typically results in short-term amnesia, not any long-term intermittent memory loss. Double Quick also offered up Ellis’s own testimony, wherein Ellis recounted conversations and events, in notable detail, that had occurred prior to the alleged incident and immediately after he awoke in jail.
 

 ¶ 11. Based on the circumstances surrounding Love’s disclosures; the testimony of Love, himself; Ellis’s testimony; the testimony of Dr. Rutkowski; and the lack of any contrary medical evidence, the trial court as a sanction against Ellis, struck the deposition testimony of Love and excluded Love from testifying at the upcoming trial. In so doing, the trial court specifically found that Ellis’s claimed “forgetfulness” regarding Love’s existence, and his knowledge about the facts of this case were not the result of any medical condition; rather, it was an intentional act to circumvent discovery deadlines so that Love could provide testimony favorable to Ellis.
 

 ¶ 12. Double Quick filed a motion for summary judgment. The motion was granted based on the trial court’s finding that there was no genuine issue of material fact as to the issue of Double Quick’s
 
 *1127
 
 actual or constructive knowledge of an atmosphere of violence on its premises at the time of the alleged incident. This appeal followed.
 

 STANDARD OF REVIEW
 

 ¶ 13. This Court conducts a de novo review of a trial court’s order granting or denying summary judgment.
 
 McMillan v. Rodriguez,
 
 823 So.2d 1173, 1176-77 (¶ 9) (Miss.2002). Summary judgment is proper only where the trial court, after construing all the evidentiary matters before it in the light most favorable to the non-moving party, finds there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law.
 
 Evans v. Hodge, 2
 
 So.3d 683, 685 (¶ 4) (Miss.Ct.App.2008) (citing M.R.C.P. 56(c)). To withstand summary judgment, the non-moving party must rebut the motion with significant probative evidence showing there are genuine issues for trial.
 
 Borne v. Dunlop Tire Corp.,
 
 12 So.3d 565, 570 (¶ 16) (Miss.Ct.App.2009) (citation omitted). The evidence necessary to meet this burden must be evidence upon which “a fair-minded jury could return a favorable verdict.”
 
 Wilbourn v. Stennett, Wilkinson & Ward,
 
 687 So.2d 1205, 1214 (Miss.1996) (citing
 
 Anderson v. Liberty Lobby, Inc.,
 
 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).
 

 ANALYSIS
 

 ¶ 14. A business owner owes an invitee a duty to exercise reasonable care to protect the invitee from reasonably foreseeable injury at the hands of another.
 
 Lyle v. Mladinich,
 
 584 So.2d 397, 399 (Miss.1991). Acts of third parties are reasonably foreseeable if the owner had cause to anticipate such acts by either: “(1) actual or constructive knowledge of the assailant’s violent nature, or (2) actual or constructive knowledge that an atmosphere of violence exists [on the premises].... ”
 
 Id.
 

 ¶ 15. As the alleged assailants are unknown in this instance, Ellis was required to produce evidence that an atmosphere of violence existed on Double Quick’s premises, such that Double Quick would have had actual or constructive notice of that atmosphere. Relevant factors for consideration of whether a defendant had such notice have been held to include “the overall pattern of criminal activity prior to the event in question that occurred in the general vicinity of the defendant’s business premises, as well as the frequency of criminal activity on the premises.”
 
 Gatewood v. Sampson,
 
 812 So.2d 212, 220 (¶ 14) (Miss.2002) (citation omitted).
 

 ¶ 16. Scott Shafer, Double Quick’s vice-president of operations, testified that the Double Quick store in question is located in a residential neighborhood down the street from Gentry High School. The store closes every night at midnight. It uses unarmed security personnel, contracted from a private security company, four nights a week, Thursday through Sunday, between the hours of 9:00 p.m. and closing, as these are the store’s peak hours. Security is also used during special occasions, such as the Fourth of July and athletic events at the high school. The store has twelve surveillance cameras, nine on the interior of the store, two on the exterior of the store looking directly into the parking lot, and one on the southeast corner of the store. The surveillance cameras are operated by a “DVR system,” which records over itself every thirty days. There are no surveillance recordings of the date(s) in question.
 

 ¶ 17. As proof supporting the atmosphere of violence factor, Ellis relies on: twelve police reports spanning a ten-year time period prior to the alleged incident; his own testimony and that of Jenkins,
 
 *1128
 
 regarding the premises at Double Quick; and the affidavit of Ellis’s liability expert, Commander Lewis. The twelve police reports are summarized as follows:
 

 March 14, 1996: Petit larceny — customer left store without paying for $6.00 worth of gasoline; charges were later dropped when customer returned to pay for the gas.
 

 July 4, 1996: Burglary — theft of two cases of beer.
 

 September 16, 2000: Disorderly conduct — fight occurred between two young males on the store’s premises after business hours.
 

 October 30, 2003: Aggravated assault— teenage female cut a teenage male’s face with a knife. The incident resulted from an argument between the two individuals which began somewhere off the store’s premises. One of Double Quick’s employees tried to intervene. The police were called, and a Double Quick employee brought the boy into the store and treated him until his brother came and took him to the hospital.
 

 January 1, 2005: Burglary — theft of cigarettes and beer.
 

 January 2, 2005: Burglary — theft of store’s safe.
 

 July 24, 2005: Malicious mischief/vandalism — dispute between boyfriend and girlfriend, boyfriend pounded on girlfriend’s vehicle with his fist.
 

 August 19, 2005: Vandalism — young boy playing in the store broke glass door with his football helmet.
 

 September 6, 2005: Simple assault — domestic dispute, boyfriend followed girlfriend onto Double Quick’s lot and asked whose car she was driving; he then pushed her body against the vehicle.
 

 July 2, 2006: Disturbing the peace— fight between two males.
 

 August 30, 2006: Petit larceny — customer left gas pump without paying for $10 worth of gasoline.
 

 October 5, 2006: Simple assault — dispute occurred between two women who knew each other; one sprayed the other with mace.
 

 ¶ 18. Ellis testified in his deposition that “drug deals” occur on Double Quick’s premises daily, as there is a “drug house” located across the street. According to Ellis, he sometimes works undercover for the Indianola Police Department as a drug buyer, and when he goes by the Double Quick he knows who is selling drugs. Ellis said he had informed the police about drug sales at this location, but he never notified Double Quick about such activity.
 

 ¶ 19. Jenkins testified that he had no personal knowledge of any drug activity taking place at the Double Quick store. But he stated that a number of people frequently hang out at the liquor store located next door to Double Quick and that they sometimes congregate at the Double Quick store itself. Jenkins stated that on one occasion, sometime prior to the incident involving Ellis, he had stopped at Double Quick to buy a coke. As Jenkins was walking out of the store, someone “said something” to him. When Jenkins “said something back,” someone threw a bottle at his truck which broke one of the truck’s windows. According to Jenkins, the bottle incident is why he got scared and left Ellis that day in October 2006. Jenkins never reported the bottle incident to Double Quick.
 

 ¶ 20. Ellis also furnished Commander Lewis’s affidavit. Relying on the above-mentioned evidence, Commander Lewis provided the following:
 

 It is my opinion to a reasonable degree of professional certainty that the attack on Jessie Dean Ellis on or about October 7, 2006 ... was a natural and fore
 
 *1129
 
 seeable consequence of the conditions and circumstances that existed on the premises on and prior to October 7, 2006. This opinion is based on the fact that there had been sufficient crime committed on the premises of the subject convenience store to place the owner on notice that reasonable security measures were needed for the security, safety and well-being of their [sic] patrons. See Crime Stats of the subject property attached hereto....
 

 ¶ 21. Based on our de novo assessment of the entire record, we agree with the trial court’s holding that Ellis presented no genuine issue of material fact as to whether Double Quick had actual or constructive notice that an atmosphere of violence existed on its property.
 

 ¶ 22. As the trial court found, of the twelve reported “criminal” acts at the Double Quick store in question during the ten year period preceding the alleged assault, only five of those, for all intents and purposes, were crimes against the person. And none of these incidents involved unprovoked assaults upon one of Double Quick’s unsuspecting patrons by unknown assailants. Rather, each offense was precipitated by some sort of pre-existing dispute between individuals who knew each other and who brought their conflicts on to Double Quick’s grounds with no forewarning to Double Quick. According to the record, Double Quick’s employees responded to each situation as reasonably as could be expected. The other reported incidents were crimes against the store. And of these, the only ones of any significance were the three burglaries, each of which occurred in the middle of the night while the store was closed for business.
 

 ¶ 23. As to the allegation of drug sales occurring on Double Quick’s premises on a daily basis, Ellis made no adequate showing that Double Quick knew or should have known that such activity was taking place on its premises. All that can be garnered from Ellis’s testimony on the matter is that he, not Double Quick, was privy to such criminal conduct. The same goes for Jenkins’s testimony with regard to the bottle incident.
 

 ¶24. True, as Ellis points out on appeal, this Court has held that prior assaul-tive acts occurring on a business owner’s premises and the assaultive act complained of are not required to be the same in order for there to be a triable issue of whether the latter was reasonably foreseeable.
 
 See, e.g., American Nat. Ins. Co. v. Hogue,
 
 749 So.2d 1254, 1260 (¶21) (Miss.Ct.App.2000) (holding that a victim who was carjacked and kidnapped from a mall parking lot by an unknown assailant was not required to bring forth evidence of an identical crime having previously occurred on the owner’s premises in order to establish that such an assault was foreseeable — pri- or acts, in one year alone, included, among others, thirteen auto-thefts, two strong-arm robberies, one robbery with a knife, one rape, and two assaults with injuries constituted sufficient, competent evidence to raise an issue of foreseeability of assaul-tive conduct in this parking lot). But we find here that Double Quick could not have reasonably foreseen an assault of this nature based on the type of incidents the store had experienced in the past. Contrary to the conclusory statements expressed by Ellis’s expert, such incidents, particularly in these numbers, do not rise to the level of violence sufficient to create a factual question as to whether Double Quick was on actual or constructive notice that an act of violence like the one claimed in this instance would occur on its premises.
 
 Cf. Magnusen v. Pine Belt Inv. Corp.,
 
 963 So.2d 1279, 1284 (¶ 20) (Miss.Ct.App.2007).
 

 
 *1130
 
 ¶25. Accordingly, we hold that Ellis has failed to demonstrate an “overall pattern of criminal activity” prior to the event in question that occurred in the vicinity of the Double Quick’s premises, and he has failed to demonstrate any “frequency of criminal activity” on the store’s premises sufficient to establish an “atmosphere of violence.” This issue lacks merit.
 

 ¶ 26. Lastly, Ellis claims the trial court erred in excluding the testimony of his witness, Love. Since Ellis cannot meet the duty element in his negligence claim, we find it unnecessary to consider the trial court’s ruling on the matter. This issue is moot.
 

 ¶ 27. THE JUDGMENT OF THE CIRCUIT COURT OF SUNFLOWER COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
 

 KING, C.J., LEE, P.J., IRVING, GRIFFIS, BARNES, ISHEE, ROBERTS, CARLTON AND MAXWELL, JJ., CONCUR.
 

 [1]
 

 . The record contains an ‘‘Appearance Ticket” that was issued to Ellis on October 7, 2006, charging him with public drunkenness, which Ellis refused to sign. When Ellis was crossed-examined by Double Quick's attorney about the charge during his deposition, Ellis had no recollection about the appearance ticket.
 

 [2]
 

 . Portions of the record refer to the alleged assault as having occurred on October 7, 2006.